# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Mitchell*, 2011 IL App (1st) 083143

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD MITCHELL, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-08-3143 |
| Filed | August 5, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the first degree murder of a minor victim was upheld over his challenges to the testimony of a fingerprint expert and a DNA expert and the denial of his request to impeach an unavailable witness. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-19684; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, Patricia Unsinn, and Steven W. Becker, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Amy Watroba Kern, and Heather Fahrenkrog, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE GARCIA delivered the judgment of the court, with opinion.

Justice Cahill concurred in the judgment and opinion.

Justice R. Gordon dissented, with opinion.

**OPINION**

¶ 1    On retrial, defendant Edward Mitchell was convicted by a jury of first degree murder and sentenced to 100 years in prison. The defendant challenges, on various grounds, the fingerprint evidence that placed the defendant in the garage where the murder weapon was recovered. He also contends the circuit court erred in rejecting his request to further impeach a material and unavailable witness, whose testimony from the defendant's first trial was read to the jury. Finally, he challenges the testimony of the State's DNA expert. The circuit court did not err in any of its rulings. We affirm.

¶ 2    BACKGROUND

¶ 3    On August 21, 1999, the defendant and codefendant Kevin Johnson were charged by indictment with first degree murder of Paulette Peake, age eight. Based on Paulette's age, the State filed notice of intent to seek an extended sentence upon conviction. Paulette was shot shortly before 9:30 p.m. on July 31, 1999, while she stood in the checkout line of Pat's Food Store, a neighborhood grocery store located at the corner of 79th Street and Sangamon Avenue in Chicago. Codefendant Johnson pled guilty to conspiracy to commit murder, attempted aggravated battery, and armed violence. In exchange for his testimony at the defendant's trial, Johnson received a sentence of 20 years, with day-for-day credit.

¶ 4    The defendant was originally convicted by a jury in 2002. This court ruled the defendant's videotaped confession was involuntary and remanded for a new trial. *People v. Mitchell*, 354 Ill. App. 3d 396, 405 (2004). The Illinois Supreme Court denied the State's petition for leave to appeal, but directed this court vacate the decision and reconsider in light of *People v. Willis*, 215 Ill. 2d 517 (2005). *People v. Mitchell*, 216 Ill. 2d 717 (2005). Upon reconsideration, this court again remanded for a new trial based on the same ground. *People*

*v. Mitchell*, 366 Ill. App. 3d 1044 (2006).

¶ 5                              Evidence at Second Trial

¶ 6        As the State's first witness, codefendant Kevin Johnson claimed he was at home all evening until immediately prior to the shooting on July 31, 1999. Johnson testified he and the defendant were shot at the day before near the grocery store, which the defendant denied in his testimony. The store surveillance video showed a rival gang member by the nickname of "Toppy" near the store at the time of the shooting. Johnson considered Toppy to be an "enemy" even though Toppy, the defendant and Johnson were members of the same gang. Johnson testified he saw the defendant shoot the rifle in the direction of the store and Toppy.

¶ 7        Three neighborhood residents also testified for the State. Mary Lewis testified she saw Toppy walking toward the store just before she heard gunfire. Mary Lewis testified she saw the defendant, the codefendant, and a third man walking back and forth near the store. According to her testimony, Mary Lewis did not see the actual shooting, though a defense investigator testified Mary Lewis told him she saw shots being fired at Toppy. Marie Coffee testified she saw codefendant Johnson running in the alley shortly after the gunfire. Demetrius Jones could not be located at the time of the defendant's second trial. On the State's motion, the circuit court ruled Jones a material witness that was unavailable to testify. The court permitted a law clerk to read Jones' testimony from the first trial to the jury.

¶ 8        At the defendant's first trial in 2002, Jones testified he was 29 years old and attending Knoxville College in Knoxville, Tennessee. When not attending college, he lived with his mother and sister on Sangamon Avenue, near the grocery store. Jones testified he was not a member of a gang, but he knew the defendant was a member of the Vice Lords gang. Jones testified that in July 1999, he was "in the Naval Academy at Great Lakes, [Wisconsin]." In a follow-up question, he clarified he was at the naval boot camp at Great Lakes. He stated he received a pass to visit his mother and sister. At approximately 9 p.m., he went with his mother to meet a family friend at a lounge at 79th Street and Morgan Avenue, one block west of Sangamon. After leaving the lounge, he and his mother walked east toward the grocery store. As they were walking, Jones looked in the direction of the school that was diagonally across 79th Street from the grocery store, where he saw the defendant with a younger man. He described the clothing the defendant was wearing. Jones and his mother stepped into the grocery store to briefly greet the owner. Upon leaving the store, Jones saw the defendant still near the school.

¶ 9        As Jones and his mother walked south to her house on Sangamon, Jones greeted Toppy and stopped to talk with a friend named Linda. While Jones was talking with Linda, he heard 6 to 10 gunshots coming from near the school. Jones ducked between a parked vehicle and a tree until the shooting stopped. During the shooting, he saw his mother jogging toward her house. He then looked in the direction of the school and saw the defendant with a rifle. Jones testified he was familiar from his military training with the type of rifle he observed. At the time Jones saw the defendant with the rifle, the defendant was wearing a black or dark blue jacket, different clothing than when he first saw him. Jones observed the defendant placed the rifle in his jacket with the barrel pointing down, but the barrel was still visible. He next

observed the defendant run east, down an alley immediately to the south of the school. Jones then ran into the grocery store, where he saw a little girl had been injured. When he exited the store, the police were on the scene and Jones observed an officer recover a bullet casing. Jones also saw Mary Lewis in the crowd that had gathered. Jones attempted to talk to an officer about what he had seen, but the officer was too absorbed in crowd control so he went home. The following day, the police were in the area. Jones told a police investigator what he saw the previous day and provided his telephone number. He testified that on August 4, 1999, he was transported by Chicago police officers from the Great Lakes naval base to the police station at Area 2. At Area 2, Jones identified the defendant in a lineup. During his testimony, Jones identified a rifle and jacket as similar to those in possession of the defendant after the shooting. Jones testified he viewed the store's surveillance tape that showed he and his mother entering and exiting the store. The tape also depicted Toppy entering and exiting the store. The tape showed Jones entering the store once again after the shooting when he saw the injured girl. On cross-examination, Jones denied he told Area 2 detectives that when the gunfire started, he pushed his mother into an alley.

¶ 10    Illinois State Police DNA analyst Harold Johnson was qualified as an expert. The defendant unsuccessfully sought to exclude the expert's testimony because "it was too inconclusive." Expert Johnson testified he extracted DNA from swabs taken of a pair of gloves recovered from the same garage where the rifle was recovered. The swabs contained a mixture of human DNA profiles from at least three individuals. He testified that to positively identify the contributor of DNA, he would need to locate "13 specific segments of the DNA" or loci. He testified he was able to obtain a profile of only four loci of three different individuals from the swabs. DNA expert Johnson opined that "1 in 71 black, 1 in 71 white and 1 in 82 Hispanic unrelated individuals cannot be excluded from having contributed to this mixture of DNA profiles." Johnson concluded the defendant "could not be excluded as a donor to that mixture." He testified his conclusion was based solely on his comparison of the 4-loci profile. On cross-examination, expert Johnson testified a 13-loci profile is necessary to make a positive identification because "13 markers *** were chosen by the FBI." He clarified that while the mixture was from at least three individuals, the mixture could have come from more than three individuals. He admitted that it was "entirely possible that twenty people wore those gloves and didn't leave DNA behind."

¶ 11    Chicago police detective Arteaga testified he determined that the bullet that struck Paulette was fired from 7915 S. Sangamon based on where Paulette was standing when she was hit by the bullet. The address is the first house that abuts the alley that runs east and west and separates the school from the residences. The house at 7915 had bushes in front. In the bushes, Arteaga recovered five 9-millimeter Luger cartridge cases and three 40-caliber Smith and Wesson cartridge cases. Arteaga testified he was "certain" the bullet that killed Paulette was the 9-millimeter bullet found inside the store and not the 40-caliber bullet found outside the store. Arteaga admitted, however, it was possible that the bullets could have been kicked around in the chaos following the shooting. A "Diagram of the Area of 79th & Sangamon Av.," depicting the grocery store, the school, the streets just east and west, and the addresses of houses on the block south of 79th Street, was admitted as State's exhibit 43.

¶ 12    On August 1, 1999, Arteaga went to a garage located at the rear of 7927 S. Sangamon.

-4-

According to codefendant Johnson, the garage was where the Vice Lord street gang, the gang he and the defendant belonged to, stored weapons and ammunition. A black HIPoint, 9-millimeter semiautomatic rifle with a metal barrel was recovered from the rear seat of a stripped-down car in the garage. The parties stipulated that the 9-millimeter bullet recovered at the grocery store and the five cartridge cases found in the bushes near the school were fired from the recovered rifle. Arteaga also found a blue windbreaker, black leather gloves, and a hat in the garage, along with numerous boxes of ammunition and a pane of glass.

¶ 13 Michael Kopina, an expert in gunshot residue testing, testified he tested the leather gloves and windbreaker recovered from the garage. To a reasonable degree of scientific certainty, expert Kopina found gunshot residue on both the gloves and left and right cuffs of the jacket.

¶ 14 The circuit court accepted Heather Adams Siemer as an expert in fingerprint examination, over the defendant's objection. Siemer testified to her analysis of latent prints from two items recovered from the garage where the rifle and clothing were discovered. A latent print was "developed" from an ammunition box, displayed as State's exhibit 67. The latent print on the box was photographed, which the State displayed as exhibit 85. Siemer also testified regarding two "lifts" of latent prints from the pane of glass, displayed in State's exhibit 74. The photograph of the lift was displayed in State's exhibit 87. As lifts, the latent prints were capable of immediate comparison to the defendant's known prints, displayed as State's exhibit 79. As to each latent print, Siemer examined the latent impression or lift "for certain things like pattern type, ridge flow, and things such as this. *** [Like] ridges that end, ridges that split into two, and short ridges or dots. I took that information from the latent [and] went along to each of the inked prints to see if I had a match." The two latent prints matched the defendant's prints from his number three finger and number eight finger. Siemer explained to the jury her comparison process with the aid of State's exhibit 86, "a court chart of the latent print from the lift." Five comparison points were marked on the chart. Siemer testified she quickly found "13 points of comparison," but did not mark all 13 points on the chart because it would "be kind messy with all the lines and stuff like that." On cross-examination, expert Siemer admitted she was unfamiliar with "ACE-V," which defense counsel characterized as "the standard method of doing fingerprint comparison now that's used by the FBI." Expert Siemer admitted she made no notes of her comparison of the latent and known fingerprints. Expert Siemer made no examination of the ammunition box for fingerprints belonging to anyone else. "Once I identified Mr. Mitchell I deferred processing." She never examined the glass pane directly.

¶ 15 The medical examiner testified Paulette was killed by a single gunshot that struck her chest and exited her back.

¶ 16 After the defendant's motion for a directed verdict was denied, three witnesses testified in the defendant's case-in-chief, including the defendant. The defendant admitted he was arrested, on the day of the shooting, around 9:30 p.m. near 80th Street and Peoria, one block east of Sangamon. The defendant denied firing a gun near the school. He admitted he was a member of the Vice Lord street gang and hung out with other gang members on the 7900 block of South Sangamon. During cross-examination, the defendant admitted hanging out in the "barn" more than 10 times. He recalled touching things in the barn when items were relocated there. The items in the barn might "possibly" have included ammunition boxes.

¶ 17     Following the State's rebuttal, the defense made an offer of proof to impeach Demetrius Jones' testimony beyond the transcript read to the jury. The defense also moved to strike the testimony of Harold Johnson, contending he was not qualified to give testimony on statistical analysis. The circuit court rejected the proposed impeachment of Jones and denied the motion to strike.

¶ 18     The jury found the defendant guilty of first degree murder after about 1 hour and 15 minutes of deliberation. This appeal followed.

¶ 19                                ANALYSIS

¶ 20     The defendant asserts three overarching issues on appeal. He challenges much of the fingerprint evidence and the DNA evidence. He also contends that the circuit court erred in rejecting the defendant's offer of proof to impeach the unavailable witness with "numerous prior inconsistent statements."

¶ 21                           Fingerprint Evidence

¶ 22     The defendant contends the testimony of the fingerprint expert lacked an adequate foundation, which opened the expert's opinion to a challenge at a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. 1923).

¶ 23                              *Foundation*

¶ 24     The defendant cites a single case, *People v. Safford*, 392 Ill. App. 3d 212 (2009), to support his claim that the fingerprint expert's opinion lacked an adequate foundation. The defendant asserts, "*Safford* is on all fours with the instant case." The State counters that "*Safford* is completely distinguishable." We agree with the State.

¶ 25     In *Safford*, we ruled that "[t]he trial court erred in admitting the testimony of the fingerprint identification expert where the foundation requirements were not met." *Id.* at 230-31. The fingerprint expert, examiner Cutro, "testified he looks at three levels of detail of each fingerprint undergoing an analysis, explaining what he looks for at each level." *Id.* at 220. Yet, as "the State conceded[,] no 'Level One, Level Two, or Level Three' detail of the comparison process involving the latent print and the defendant's known print was ever testified to by examiner Cutro." *Id.* at 221. The State's concession was consistent with our reading of the record. "We find no testimony by examiner Cutro as to how he arrived at his conclusion that the latent print in question could only belong to the defendant." *Id.* at 221. Ultimately, "[w]e agree[d] with the defendant's argument that although the scientific community is divided as to how many points of comparison are needed to make a positive identification, the proffered expert must be subject to challenge on the analysis he undertook to arrive at his conclusion, regardless of the method he followed. Otherwise, the basis for making a positive identification between the latent and exemplar prints is not subject to scrutiny." *Id.* at 225. While examiner Cutro testified to the "general process he follow[ed] in fingerprint identification," he was unable to describe what he saw in common between the latent print and the known print, which made his identification of latent print as the

defendant's print beyond challenge during cross-examination. *Id.* at 220, 223. We reasoned that fingerprint analysis involves the comparison of "unique, distinctive characteristics of the latent print" to a known print of the defendant to warrant the conclusion that the latent print "belonged to no one other than the defendant," a conclusion the expert must be able to explain. *Id.* at 225, 228.[1] "[Examiner] Cutro never testified to any number of points of comparison that he found between the latent print from the patrol car and the defendant's print." *Id.* at 217.

¶26 The facts in this case stand in contrast to the fingerprint examiner's testimony in *Safford*. Here, examiner Siemer explained the procedure she followed to make a comparison of the latent prints and the defendant's known prints. Examiner Siemer stated she did a side-by-side comparison of the latent prints and the defendant's known sample, looking for "ridge type, pattern flow, and things such as this. The fine details. The ridges that end, split into two, short ridges or dots." Following this side-by-side comparison, she identified the latent prints on the ammunition box as matching the defendant's right middle finger. Regarding the "lifted" print from the glass pane, examiner Siemer identified the defendant's left middle finger as matching that print. Examiner Siemer stepped into the well of the courtroom to demonstrate to the jury on State's exhibit 86 and exhibit 38, the five specific points of comparison between the lifted print and the defendant's known print. Examiner Siemer testified she "quickly" found 13 points of comparison between the two prints.

¶27 Thus, the situation in *Safford*, where no points of comparison were ever identified, is not present in this case where examiner Siemer testified to 13. The points of comparison, which examiner Siemer identified, provided ample grounds to challenge her opinion that the recovered prints matched the known prints of the defendant had the defendant elected to do so.

¶28 Examiner Siemer's opinion that the defendant's fingerprints were found on items in the barn leads us to the last distinction between the instant case and *Safford*. In *Safford*, the fingerprint expert placed the defendant at the patrol car from where the shooting took place. "[The fingerprint expert] determined that one latent print found on the lower left corner of the hood of Officer Marcano's patrol car matched the inked print card of the defendant." *Id.* at 216. If this fingerprint evidence was trustworthy and reliable, then it destroyed the defendant's otherwise strong alibi defense provided by three "unbiased witnesses." *Id.* at 229. In our adversarial system of justice, meaningful cross-examination of examiner Cutro's opinion that the defendant placed his hands on the patrol car was essential to "place confidence in the outcome of [the] trial." *Id.* at 224. "A jury may be so swayed by such

---

[1]The State takes issue with *Safford* to the extent it "stands for the proposition that the lack of points of comparison goes to the admissibility of the evidence, as opposed to the weight." We reiterate our statement in *Safford*, which controlled our finding of error in that case. "While the paucity of points of similarity may go to the weight of the evidence rather than admissibility [citation], as the paucity approaches zero, our concern is no longer with weight but with admissibility." *Id.* at 225. In other words, had examiner Cutro testified that there were zero points of comparison between the latent and exemplar prints, his opinion that the prints matched would be legally inadmissible.

evidence that strong alibi witnesses have little chance of being found credible when fingerprint evidence points to the defendant being present at the scene of the crime." *Id.* at 225. In the instant case, however, the defendant's fingerprints were discovered on objects in the garage that the defendant acknowledged was controlled by his gang. During his testimony, the defendant admitted that he may very well have touched items in the garage during his more than 10 visits to the garage. As such, the discovery of the defendant's prints on two items recovered from the garage was hardly unexpected. Unlike in *Safford*, the fingerprint evidence in the instant case did not provide direct evidence of the defendant's guilt.

¶ 29    *Safford* is neither legal authority for the defendant's claim that an evidentiary foundation was lacking for examiner Siemer's expert testimony, nor factually similar regarding the significance of the fingerprint examiner's testimony.

¶ 30                                        *Frye Hearing*

¶ 31    The defendant's contention that he was entitled to a *Frye* hearing to challenge examiner Siemer's methodology used in her comparison of the latent and known prints is also unavailing because fingerprint analysis is neither novel nor new. Until our supreme court decides otherwise, as it did with regard to the HGN evidence in *People v. McKown*, 226 Ill. 2d 245, 257 (2007), there is no authority in this state for the defendant's claim that the circuit court erred in rejecting the defendant's motion for a *Frye* hearing on the admissibility of fingerprint evidence. Nor are we persuaded to provide such authority in this case.

¶ 32                                        DNA Evidence

¶ 33    In his main brief, the defendant premises his challenge to the DNA testimony on the following contention. "The State's forensic DNA analyst Harold Johnson, who was qualified as an expert in this field, testified that Mitchell could not be excluded from having contributed DNA to a pair of gloves that allegedly were worn by the shooter." The defendant sought to exclude this testimony before the trial court on the basis that "[i]t's not an identification of Mr. Mitchell by any stretch of the imagination. Falls far below the FBI standards to make an identification."

¶ 34    We do not disagree with the defendant's statement. We note only that DNA expert Johnson never testified that the defendant's DNA was found on the pair of gloves. Expert Johnson testified that the defendant could not be excluded as having contributed to the DNA mixture discovered in the gloves, just as 1 in 71, or 10 in 710, or 100 in 7,100 African Americans could not be excluded. The DNA expert's testimony did not place the defendant's DNA in the gloves; the defendant's DNA simply could not be excluded from the profile developed from the mixture of DNA recovered from the gloves. We reject the defendant's contention that this DNA evidence could have overpersuaded the jury in light of its clear and limited import.

¶ 35    In any event, it falls to the discretion of the trial court to determine the admissibility of expert testimony. *Safford*, 392 Ill. App. 3d at 221 (citing *People v. Mack*, 128 Ill. 2d 231, 250 (1989)). In the absence of Illinois authority that DNA evidence is excludable as a matter of

law based on the evidence being "too inconclusive," we reject the instant defendant's claim that the equivocal nature of expert Johnson's opinion rendered his testimony legally inadmissible. While the circuit court certainly had discretion to disallow the expert's testimony if it determined its probative value was minimal, the court had the discretion to allow the triers of fact to assess that testimony and assign the weight, if any, the testimony warranted. Of course, a reasonable jury was free to disregard expert Johnson's testimony that the DNA profile did not exclude the defendant from having worn the recovered gloves in favor of direct evidence from codefendant Johnson that the defendant wore those gloves when he fired the rifle in the direction of the neighborhood grocery store, where Paulette stood in line.

¶ 36      Finally, as to the statistical figures regarding the likelihood of individuals contributing to the DNA mixture recovered from the gloves, the defendant complains that the DNA expert "simply enters the alleles into a computer program, and it does the calculation for him." The defendant does not suggest how else the statistical figures should be calculated. We decline to address this claim further when the defendant fails to make clear his position or provide authority for his contention of error. See generally *In re Jessica M.*, 399 Ill. App. 3d 730, 743-48 (2010) (describing the evolution of DNA analysis, including the statistical aspect of DNA profiling).

¶ 37      The defendant provides us with no persuasive reason to rule expert Johnson's testimony was inadmissible as a matter of law, when the equivocal nature of the testimony was readily apparent to reasonable jurors.


¶ 38                                   Unavailable Witness

¶ 39      Finally, the defendant contends he should have been allowed to impeach the testimony of Demetrius Jones from the first trial, "with numerous prior inconsistent statements." The defendant fails to explain how this further impeachment would have taken place, given that Jones' testimony was read to the jury by a law clerk. To the extent the impeachment would have occurred by posing additional questions as if Jones were present at the second trial, we reject such a novel and unprecedented contention. More fundamentally, we reject the defendant's contention that additional impeachment of Jones' testimony was possible than the impeachment that occurred at the first trial.

¶ 40      In his main brief, the defendant contends the circuit court erroneously denied additional impeachment of Jones' testimony "from three different sources: (1) Jones' September 2, 1999, statement to the police in which he stated that, after he heard shots, he pushed his mother toward the alley (not watched his mother jog to her house, as he testified at trial) and then turned around to see [the defendant] with a rifle in the direction of the store; (2) Jones' grand jury testimony wherein he clarified that [the defendant] was not trying to conceal a rifle and that 15 seconds elapsed between the time that Toppy passed by him and the time he heard shots; and (3) Jones' August 4, 1999, written statement in which he said that from the time he left [the grocery store] until he heard the shots 10 to 15 seconds elapsed, as well as that, after the shots, he got up slowly and walked towards [the grocery store]."

¶ 41      As the State correctly points out, Jones was impeached at the first trial with a statement

he allegedly made to Area 2 detectives, that when the gunfire started, he pushed his mother into an alley. We see no difference between this impeachment at the first trial and the first source of prior inconsistent statements the defendant sought to introduce at the second trial. As to the second source of prior inconsistent statements, the defendant does not explain why the grand jury testimony, sworn as it was, was not admissible under 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2008)), both substantively and for impeachment purposes. See *People v. McCarter*, 385 Ill. App. 3d 919, 930-31 (2008) (explaining the requirements of section 115-10.1, which allows a written prior inconsistent statement of a witness to be admitted as substantive evidence). In any event, neither point of "additional impeachment," regarding the concealment of the rifle or the elapsed time based on Jones' testimony before the grand jury, would have undermined Jones' trial testimony. Finally, the defendant fails to persuade us that the third source of prior inconsistent statements, regarding the number of seconds that elapsed and the manner in which Jones walked, qualified as impeachment.

¶ 42      Furthermore, the authority the defendant cites for this claim of error is inapposite. The circumstances in *People v. Smith*, 127 Ill. App. 3d 622, 624-25 (1984), are too dissimilar to provide any support that Jones' testimony at the first trial could be impeached with "prior inconsistent statements," when Jones was ruled unavailable at the second trial. The rule announced in *Smith* does not reach the circumstances present in this case. "Where a statement of an abs2ent declarant is properly admitted into evidence under one of the hearsay exceptions, the opposing party may impeach such statement with a prior inconsistent statement by the declarant." *Id.* at 630.

¶ 43      Here, Jones was present and testified at the defendant's first trial. Jones' testimony is not the equivalent of a "[statement of the absent declarant, Boyle,] who was present at the scene of the crime, [but] died prior to trial." *Id.* at 630. The fairness concerns expressed in *Smith* are not present before us. "At trial, Boyle's statements that the defendant was the assailant were admitted into evidence. Under these circumstances, Mrs. Smith should have been permitted to testify that Boyle told her that he was not sure who attacked [the murder victim.]" *Id.* at 630. Those circumstances are not the circumstances in this case.

¶ 44      In the absence of clear authority to the contrary, the circuit court did not err in rejecting the defendant's efforts to "impeach" Demetrius Jones with "numerous prior inconsistent statements" not introduced at the defendant's first trial.

¶ 45                              Cumulative Error

¶ 46      The defendant argues the cumulative effect of the claimed errors deprived him of a fair trial. Because we rejected each individual claim of trial court error, this cumulative contention has no merit. See *People v. Garmon*, 394 Ill. App. 3d 977, 991 (2009) (before cumulative error can be recognized, "there must first be a showing of individual error").

¶ 47                              Sentencing Credit

¶ 48      The defendant claims he is entitled to an additional 12 days of credit for time served in custody prior to sentencing. The State acknowledges the defendant may have been arrested

on July 31, 1999. We direct the mittimus be corrected to show an additional 12 days credit for time served in custody prior to sentencing.

¶ 49                                          CONCLUSION

¶ 50    The circuit court did not err in permitting the fingerprint expert and the DNA expert to testify over the defendant's objections. The defendant had a full opportunity to cross-examine the experts. There is no support in Illinois jurisprudence for the defendant's claim that he was entitled to a *Frye* hearing to challenge the particular methodology of the State's fingerprint expert. The testimony of a witness from the defendant's first trial of a witness found to be legally unavailable was not subject to additional impeachment on the claims urged by the defendant. We find no reason to question the jury's verdict of guilty.

¶ 51    Affirmed; mittimus corrected.

¶ 52    JUSTICE ROBERT E. GORDON, dissenting:

¶ 53    I respectfully dissent.

¶ 54    On this appeal, defendant claims that the trial court erred by: (1) admitting the testimony of Dr. Siemer, a fingerprint expert who failed to support or provide a basis for most of the comparison points that she claimed to have found; (2) failing to conduct a *Frye* hearing to determine if the underlying methodology of this fingerprint expert's opinion had gained general acceptance; (3) refusing to allow defendant to impeach the testimony of a missing witness, whose testimony was read into the record, with prior inconsistent statements; (4) admitting the testimony of the State's DNA expert whose testimony was based on an analysis of only 4 loci when a 13-loci analysis is standard for a match; (5) admitting statistical testimony from the State's DNA expert when he was not qualified as an expert in statistics; and (6) denying defendant a fair trial from the cumulative effect of these errors. For the following reasons, I would reverse.

¶ 55    First, I would find that, after defendant raised the issue of lack of evidentiary support for admission of the fingerprint evidence, the trial court erred by failing to consider whether the State had established an adequate basis for admission of this evidence. Second, after reviewing the entire record, I would find that the State did fail to establish an adequate basis for the expert's testimony. Third, I would find that, in light of the contradicting narratives offered by the State's own witnesses, this error was not harmless. Fourth, I would find that the trial court also erred with respect to the fingerprint evidence by failing to hold a *Frye* hearing concerning whether the particular methodology employed by this particular examiner in this case had gained general acceptance. Fifth, I would find that the trial court erred by not permitting defendant to perfect the impeachment of the missing witness by introducing evidence of the prior inconsistent statements. Sixth, since the missing witness was one of only two event witnesses who testified to observing defendant with a rifle and the other was the codefendant, who provided self-serving testimony, I would find that this error was also not harmless. Last but not least, the cumulative effect of these errors requires reversal and

a remand for a new trial. Since I would reverse on these issues, I do not reach the DNA issues raised by defendant on this appeal.

¶ 56                                                      BACKGROUND

¶ 57          The only issue at trial was the identity of the gunman whose bullet killed Paulette Peake. The State's evidence established that the bullet that killed Peake went completely through her body and that the one spent bullet recovered from inside the store did not contain blood or bodily residue.

¶ 58          One issue at trial was which bullet, of the many bullets recovered, was the fatal bullet. The State's evidence indicated the possibility of three gunmen. First, a neighbor testified that she observed three young men patrolling the area immediately before the shooting. Second, the State's evidence established that three types of ammunition were recovered from the scene: 9 millimeter, 380 caliber and 40 caliber. The police sergeant who collected the crime scene evidence testified that he was "certain" that the bullet that killed Peake was the 9-millimeter bullet found inside the store, and not a 40-caliber bullet found outside the store, although he admitted that it was possible that bullets could have been inadvertently kicked around in the chaos that followed the shooting. The parties stipulated that the 9-millimeter bullet was fired from a rifle that police recovered from a nearby garage.

¶ 59          The only witnesses who provided evidence relating to the identity of the rifle gunman were: (1) codefendant Kevin Johnson, who testified in exchange for a 10-year reduction in sentence and whose testimony was contradicted in part by a neighbor, Mary Lewis; (2) missing witness Demetrius Jones, whose prior testimony was read into the record and whose prior inconsistent statements were not admitted at trial and thus are now an issue on this appeal; (3) Mary Lewis, a neighbor, who testified that defendant, as well as codefendant and a third man, were walking back and forth in the area prior to the shooting; and (4) the forensic evidence which is disputed on this appeal.

¶ 60          Of the event witnesses, only codefendant testified that he observed defendant actually shooting a rifle at the store. The missing witness claimed to have observed defendant after the shooting with a rifle in his hands. Although the testimony of Mary Lewis placed defendant, as well as codefendant and a third man, at the scene and walking back and forth, she admitted that she never saw who was shooting. Also, codefendant denied that he was walking back and forth, claiming instead that he was in his house all evening until immediately prior to the shooting. Another neighbor, Marie Coffee, testified that she observed codefendant running in the alley shortly after the gunfire.

¶ 61          No fingerprints were recovered from the rifle. The State's DNA experts testified that defendant could not be excluded from a mixture of DNA profiles obtained from a pair of gloves that codefendant testified were worn by defendant during the shooting. The mixture was created by at least three people. The State's fingerprint expert testified that defendant's prints were lifted from a box of 32-caliber ammunition and a pane of glass found in the same garage, which was used by defendant's gang as a hangout and where police found the 9-millimeter rifle and the gloves.

¶ 62          Another issue was the motive behind the shooting. Two possible targets of the shooting

suggested by the evidence were: a rival gang; and a fellow gang member named "Toppy." Codefendant testified that a rival gang member had shot at him and defendant on July 30, 1999, the day before the shooting, at the same location. However, there was no evidence that the rival gang was present on July 31, the day of the shooting, and defendant denied being shot at by anyone the night before the murder. As for Toppy, the store surveillance videotape indicated that Toppy was inside the store immediately prior to or at the time of the shooting, and codefendant testified that he considered Toppy to be an "enemy" although they were members of the same gang. Specifically, Mary Lewis, a neighbor, testified that she saw Toppy walking toward the store and then heard gunfire. Demetrius Jones, the missing witness, testified that he reviewed the store's security videotape from the time shortly before and after the shooting and that on the tape he observed Toppy enter and exit the store. In addition, Steven Glazier, a defense investigator, testified that Mary Lewis had told him that she observed shots being fired at Toppy.

¶ 63    The State's key witnesses provided conflicting narratives of the events.

¶ 64    For example, the testimony of codefendant Kevin Johnson that he was in his house all afternoon and evening until 9 p.m. was contradicted by the testimony of a neighbor, Mary Lewis, who testified that, while she was on or near her front porch starting at 6 p.m. and through most of the evening, she saw Kenny and Kevin (codefendant) hanging out by Leo High School with defendant.

¶ 65    Marie Coffee, a neighbor, identified codefendant Johnson from a photographic array as the man she had seen running down an alley less than a minute after she had heard gunfire. At trial, Coffee denied having told an officer that she had also observed this man fire four to five rounds at Pat's store from a handgun, and that she recognized the man from the neighborhood but she did not know his name. Officer Paul Bailey, who had interviewed Coffee shortly after the shooting, testified that Coffee had, in fact, told him these things.

¶ 66    The conflicts concerning the location and actions of codefendant Kevin Johnson are crucial since in our legal analysis we must determine whether any error against defendant was harmless in light of the other evidence against him.

¶ 67                                    ANALYSIS

¶ 68    As I stated above, I would find first that, after defendant raised the issue of lack of evidentiary support for admission of the fingerprint evidence, the trial court erred by failing to consider whether the State had established an adequate basis for admission of this evidence. Second, after reviewing the entire record, I would find that the State failed to establish an adequate basis for the expert's testimony. Third, I would find that, in light of the conflicting narratives offered by the State's own witnesses, this error was not harmless. Fourth, I would find that the trial court also erred with respect to the fingerprint evidence by failing to hold a *Frye* hearing concerning whether the particular methodology employed by this particular examiner in this case had gained general acceptance. Fifth, I would find that the trial court erred by not permitting defendant to perfect the impeachment of the missing witness by introducing evidence of the conflicting statements. Sixth, since the missing witness was one of only two event witnesses who testified to observing defendant with a rifle

and the other was the codefendant, who provided self-serving testimony, I would find that this error was also not harmless. Last but not least, the cumulative effect of these errors requires reversal and a remand for a new trial.

¶ 69    I will now analyze each of these points in order.

¶ 70                        I. Fingerprint Evidence: Inadequate Basis

¶ 71    Defendant challenges the fingerprint evidence by claiming, first, that the trial court erred by admitting the testimony of a fingerprint expert who failed to support the majority of the comparison points which she claimed to have found; and, second, that the trial court erred by failing to conduct a *Frye* hearing concerning the methodology of this particular fingerprint expert. In this section, I will analyze the first claim, which concerned the lack of an adequate basis.

¶ 72                        A. Standard of Review: Lack of Basis

¶ 73    The parties dispute the appropriate standard of review for defendant's first claim. Defendant claims that an appellate court reviews *de novo* the issue of whether the proponent has laid an adequate basis for a latent fingerprint expert's testimony, and he cites in support this district's decision in *People v. Safford*, 392 Ill. App. 3d 212, 221-22, 226 (2009). In response, the State claims that we review only for an abuse of discretion the issue of whether the trial court properly admitted the expert's testimony, and it cites the Fifth District's opinion in *People v. Mehlberg*, 249 Ill. App. 3d 499, 533 (1993).

¶ 74    In *Safford*, we agreed that the admission of expert testimony is generally left to the discretion of the trial court. *Safford*, 392 Ill. App. 3d at 221 (citing *People v. Mack*, 128 Ill. 2d 231 (1989)). However, we observed that proper admission requires the proponent to show an adequate basis for the opinion. *Safford*, 392 Ill. App. 3d at 221 (citing *Hiscott v. Peters*, 324 Ill. App. 3d 114, 122 (2001)). An adequate basis requires a showing that the expert based his or her opinion on reliable information. *Id*. Whether the basis was adequate is a question of law, which we review *de novo*. *Safford*, 392 Ill. App. 3d at 221 (citing *Peters*, 324 Ill. App. 3d at 123 (it is a "question of law *** whether there was a sufficient basis for the expert's opinions")). Specifically, we stated in *Safford* that determining whether an adequate basis was shown "presents a question of law." *Safford*, 392 Ill. App. 3d at 221.

¶ 75    I would adhere to what we wrote in *Safford* and apply a *de novo* standard of review. In addition, I observe in this case, as we did in *Safford*, that there are no facts in dispute concerning this issue. The State conceded in its appellate brief that its fingerprint expert did not make any notes regarding the detail of the prints during her analysis. The State also conceded that, although its expert claimed to have based her opinion on finding 13 points of comparison during her analysis, she marked only 5 points on the enlarged photographs used during trial and did not have any documents to show the other 8 points. Where the facts are not in dispute, our review is also *de novo*. *Safford*, 392 Ill. App. 3d at 221-22 (citing *People v. Chapman*, 194 Ill. 2d 186, 217 (2000)).

¶ 76    In addition, the case on which the State relies, *Mehlberg*, was in a different procedural

-14-

posture than the case in bar and, as a result, is less instructive. In *Mehlberg*, after the trial court ruled that the type of test was generally accepted, the trial court specifically told defendant that he still had the right to file a pretrial motion challenging the specific procedures and methodology used in his case. *Mehlberg*, 249 Ill. App. 3d at 534-35. However, defendant chose not to file such a motion. *Mehlberg*, 249 Ill. App. 3d at 534-35. Even though he chose not to file a pretrial motion, defendant did argue on appeal that the trial court was required to scrutinize the specific procedures used in the case before ruling on admissibility, a contention that the appellate court rejected. *Mehlberg*, 249 Ill. App. 3d at 539. However, it is not clear whether defendant was arguing that the trial court had the responsibility to scrutinize these procedures *sua sponte*. By contrast, in the case at bar, defendant did file a pretrial motion, and the issue before us is the appropriate standard of review for the denial of such a motion. *Safford* is closer to our case since it is clear that in *Safford* the defendant objected specifically in response to receiving a report without any supporting notes and before the examiner's testimony. *Safford*, 392 Ill. App. 3d at 216.

¶ 77                                      B. Inadequate Basis

¶ 78        In the case at bar, defendant filed a written pretrial motion on August 4, 2008, to exclude testimony by the fingerprint expert, arguing that "[b]ased on [her] report it is impossible to tell whether [she] is qualified as a fingerprint examiner, whether the minimum number of ridge detail matches were found, and whether the standard ACE-V method of examination was followed."

¶ 79        At a pretrial hearing on August 18, 2008, defense counsel argued: "the reason why I take this stance is I have absolutely no information as to what methodology this [expert] used because his notes consist of one line." The trial court responded that it was "a question of credibility not admissibility." The defense renewed its objection at trial, when the State tendered Siemer as a fingerprint expert, and the trial court overruled the objection. In defendant's posttrial motion, the defense again objected to "the fingerprint evidence and the methodology employed in this case."

¶ 80        Neither party disputes the legal proposition that a proponent of expert evidence must show an adequate basis for its admission, nor could this time-honored proposition be disputed. *People v. McKown*, 236 Ill. 2d 278, 311 (2010) (finding that "the absence of a proper foundation" is "error"). "An expert's opinion is only as valid as the basis and reasons for the opinion." *Wilson v. Bell Fuels, Inc.*, 214 Ill. App. 3d 868, 875 (1991) (citing *McCormick v. Maplehurst Winter Sports, Ltd.*, 166 Ill. App. 3d 93, 100 (1988)). "A party must lay a foundation sufficient to establish the reliability of the bases for the expert's opinion." *Petraski v. Thedos*, 382 Ill. App. 3d 22, 28 (2008) (citing *Turner v. Williams*, 326 Ill. App. 3d 541, 552-53 (2001)). Expert opinions based on guess, speculation or conjecture are inadmissible. *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 886 (1999).

¶ 81        In *Safford*, we explained why, for fingerprint evidence, it is particularly important for a trial court to determine whether the State has shown an adequate basis:

> "Fingerprint evidence is extremely persuasive. A jury may be so swayed by such

-15-

evidence that strong alibi witnesses have little chance of being found credible when fingerprint evidence points to the defendant being present at the scene of the crime. The persuasiveness of fingerprint evidence reinforces the need to require a proper foundation to establish its admissibility." *Safford*, 392 Ill. App. at 225.

¶ 82     In the case at bar, the trial court did not make a specific determination whether the State had shown an adequate basis. Instead, the trial court ruled that the issue of whether there was a lack of evidentiary support for the expert's conclusions was solely an issue of credibility or weight for the jury, rather than an issue of admissibility. The trial court erred in this legal ruling.

¶ 83     Once defendant raised the issue that there was a lack of evidentiary support for the expert's conclusions, this issue became a factor that the trial court was required to consider first in determining admissibility. If the trial court determined that the State had shown an adequate basis to admit the evidence, then any alleged deficit in evidentiary support would become a factor that the jury could also consider later when determining the weight to give to the expert's testimony. However, the trial court made an erroneous legal determination when it held that the alleged lack of evidentiary support was a question of weight alone, and not an issue of admissibility.

¶ 84     The facts in the case at bar are similar to the facts in *Safford*. In *Safford*, the fingerprint expert made no notes concerning his visual examination of the prints, except to record whether there was or was not an identification. *Safford*, 392 Ill. App. 3d at 220. His conclusion was then verified by another examiner. *Id*. At trial, he explained the general process that he followed, which is to look at three levels of detail for each fingerprint. *Id*. He did not testify to a particular number of comparison points, explaining that he belonged to a group of experts that did not exclusively base their conclusions on the comparison points. *Safford*, 392 Ill. App. 3d at 217.

¶ 85     The case at bar is similar to *Safford*, in that both experts did not make notes and both experts had their conclusions verified by another examiner. The case at bar differs from *Safford* in that, in our case, the expert did offer an explanation at trial for 5 of the 13 points that she claimed to have found between defendant's print and the print lifted from the pane of glass.

¶ 86     However, the lack of any explanation for the other eight points, which the expert claimed to have found curtailed the defendant's ability to cross-examine the witness. In *Safford*, we stated that our problem with the expert's testimony was that the examiner claimed to have based his opinion upon facts personally known to him, but he failed to testify to those facts. *Safford*, 392 Ill. App. 3d at 227. Similarly, in the case at bar, the expert testified that she based her opinion on 13 points of comparison, which she found "pretty quickly," but then she failed to testify to the facts underlying the overwhelming majority of those points. Thus, for the same reasons we held in *Safford*, I would hold here that the State failed to establish an adequate basis for the opinion offered by its fingerprint expert.

¶ 87                              C. Not Harmless Error

¶ 88     Having found error, I turn next to the question of whether the error was harmless.

*Safford*, 392 Ill. App. 3d at 230 (holding that admission of the fingerprint evidence was not harmless). An error is harmless if "it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Stechly*, 225 Ill. 2d 246, 304 (2007).

¶ 89    The fingerprint expert's testimony served to corroborate the testimony of codefendant. The expert's testimony about a match corroborated codefendant's testimony that he observed defendant shooting a rifle at the store, since the rifle was later found in close proximity to the pane of the glass that yielded the print.

¶ 90    Codefendant was the only witness who claimed to have observed defendant shooting at the store. The missing witness claimed to have observed defendant after the shooting with a rifle in his hands. Although the testimony of Mary Lewis placed defendant, as well as codefendant and a third man, at the scene, she admitted that she never saw who was shooting.

¶ 91    Codefendant's testimony was called into question by the fact that he was testifying in return for a reduction of his sentence in half, by the conflicting testimony of one of the State's own witnesses, and by the State's own ballistic evidence. First, codefendant testified that, in exchange for testifying at defendant's trial, he was allowed to serve only half of his 20-year sentence. Second, codefendant's testimony that he was in his house all afternoon and evening until 9 p.m. was contradicted by the testimony of State witness Mary Lewis, who testified that, while she was on or near her front porch starting at 6 p.m. and through most of the evening, she observed codefendant walking back and forth near the crime scene. Last but not least, codefendant testified that there was only one gunman. However, Mary Lewis testified that she observed three men patrolling the area immediately prior to the shooting, and the State's ballistic evidence established that three types of ammunition were recovered from the crime scene, indicating the firing of three different guns.

¶ 92    For these reasons, I cannot find "beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Stechly*, 225 Ill. 2d 246, 304 (2007).

¶ 93                    II. Fingerprint Evidence: *Frye* Hearing

¶ 94    Second, with respect to the fingerprint evidence, defendant also claims that the trial court erred by failing to conduct a *Frye* hearing concerning the methodology of this particular fingerprint expert and whether it had gained general acceptance.

¶ 95    Our supreme court has held that, although a test performed according to accepted standards might satisfy the *Frye* standard for admissibility, the test as performed by the expert in a particular case still might not meet the *Frye* standard. *People v. McKown*, 236 Ill. 2d 278, 308, 311 (2010). The burden is on the State to prove that the expert's methodology was generally accepted in the scientific community. *McKown*, 236 Ill. 2d at 294. "We review the trial court's conclusion that the State has met this burden *de novo*." *McKown*, 236 Ill. 2d at 294-95.

¶ 96    Prior to trial, defendant filed a motion *in limine* requesting a *Frye* hearing concerning the methodology of this particular fingerprint examiner. The defense observed that it had not received a curriculum *vitae* for the examiner. Based on the examiner's report, defendant argued that "it was impossible to tell whether [the examiner] is qualified as a fingerprint

examiner, whether the minimum number of ridge detail matches were found, and whether the standard ACE-V method was followed."

¶ 97    At the pretrial hearing on the motion, held on August 18, 2008, defense counsel again argued for an evidentiary hearing on "the methodology used by the particular examiner." Counsel argued that there was an issue "whether this guy knows what he is doing, whether he could use accepted technology, accepted methodology in the field." In response, the trial court ruled this "is a question of credibility not admissibility."

¶ 98    At the trial, immediately after the examiner recited her qualification, defense counsel objected and the objection was overruled. During cross-examination, the examiner admitted that she had never heard of the ACE-V method and that she did not know whether the ACE-V method was the standard used by the FBI for fingerprint examination.

¶ 99    ACE-V is an acronym standing for " 'Analysis, Comparison, Evaluation, and Verification.' " National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward 137 (2009). It has been accepted as the standard method of fingerprint analysis since 1959. *Id*. First, the examiner must analyze the print, considering the many factors that may "introduce variability in the resulting impression." *Id*. Second, the examiner must compare the details of the print in question to the known standard. *Id*. at 138. Third, the examiner must "evaluate[ ] the sufficiency of the detail present" in both the print and the standard "to establish an identification." *Id*. Fourth, another qualified examiner must repeat these steps and arrive at the same conclusion. *Id*.

¶ 100    In a case, such as the one at bar, where the defense has legitimately called into question the examiner's methodology and knowledge of accepted standards, it was error not to hold a *Frye* hearing on that issue. *McKown*, 236 Ill. 2d at 308, 311. The trial judge's response, that fingerprints had been accepted in the State of Illinois since before he was born, misses the issue. The trial court's subsequent ruling, that the expert's methodology was solely an issue of credibility and not admissibility, was a legal error. For the reasons already discussed above, this error was not harmless.

¶ 101                    III. Impeachment Evidence

¶ 102    Defendant also claims that the trial court erred by not allowing him to perfect the impeachment of the missing witness by introducing evidence of the witness's prior inconsistent statements. Specifically, defense counsel had sought, at defendant's second trial, to call the police officers who interviewed Jones, or to introduce his grand jury testimony or prior written statement to impeach this witness.

¶ 103    The trial court denied defendant's motion on the ground that these statements were available to prior counsel at the time of the first trial and that prior counsel had cross-examined Jones based on them.[2] However, prior counsel did not perfect the impeachment by

_____

[2]While prior counsel had asked Jones about the police interview on August 4, 1999, and had touched briefly on his grand jury testimony, it does not appear that prior counsel inquired about Jones' September 2, 1999, statements.

introducing the written statements or calling the police officers who heard the statements.

¶ 104                            A. Standard of Review

¶ 105    The parties disagree about the appropriate standard of review. The State claims that this is purely an evidentiary matter and evidentiary issues are subject to an abuse of discretion standard. In contrast, defendant argues that this issue affected his sixth amendment confrontation rights and that constitutional issues are subject to *de novo* review.

¶ 106    In order to determine the appropriate standard of review, we must first determine what defendant is, and is not, arguing on appeal. Defendant does not claim on appeal that the trial court erred by permitting the State to introduce the prior trial transcript of the missing witness. In addition, during the second trial, defendant's counsel had informed the trial court that he was considering asking the trial court to read the transcript without the cross-examination. However, before the transcript was read to the jury, defense counsel asked the trial court to include the cross-examination. Thus, on this appeal, defendant is not contesting the admission of the prior trial transcript, both the direct and cross, of the missing witness.

¶ 107    On this appeal, defendant claims that the trial court erred only by denying him the right to perfect the impeachment by introducing evidence of prior inconsistent statements. Neither party has provided a citation as to whether the denial of the right to perfect is a constitutional issue or a purely evidentiary matter. This court has found only one prior decision on this question, and it held that this issue is not a constitutional one. *United States ex rel. Ruddock v. Briley*, 216 F. Supp. 2d 737, 744 (N.D. Ill. 2002). However, that court acknowledged that it could not locate any other relevant decisions. *Briley*, 216 F. Supp. 2d at 744.

¶ 108    I do not need to resolve this issue in this case since the standard of review would be the same whether the right to perfect was a constitutional or purely evidentiary question. Although most evidentiary questions are reviewed only for an abuse of discretion, "reviewing courts sometimes review evidentiary rulings *de novo*." *People v. Hall*, 195 Ill. 2d 1, 21 (2000). This exception applies to evidentiary rulings that were "uniquely legal rulings." *Hall*, 195 Ill. 2d at 21. In the case at bar, the trial court permitted no perfection, on the ground that prior counsel had cross-examined. The trial court stated that it did not believe that a defendant could introduce evidence "to impeach testimony given under oath at a previous trial." This was a purely legal ruling, which we may review *de novo*. *Hall*, 195 Ill. 2d at 21 (*de novo* review is appropriate when the trial court applies "a broadly applicable rule").

¶ 109                         B. Right to Perfect Impeachment

¶ 110    The right to perfect impeachment of a missing witness is now codified in the new Illinois Rules of Evidence, which took effect on January 1, 2011. Rule 806 states in relevant part:

"When a hearsay statement[3] *** has been admitted in evidence, the credibility of the

---

[3]The missing witness's testimony was hearsay but was admissible under the exception for former testimony by a witness whom the court finds to be unavailable. See generally Ill. R. Evid. 804(b)(1) (eff. Jan. 1, 2011).

-19-

declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with defendant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain." Ill. R. Evid. 806 (eff. Jan. 1, 2011).

If the above rule was in effect at the time of defendant's trial, then the trial court's ruling–that defendant's prior opportunity to cross-examine barred his present right to perfect the impeachment–was clearly error. The rule states that the impeachment "may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." Ill. R. Evid. 806 (eff. Jan. 1, 2011).

¶ 111    I find that the substance of the rule was in effect, although it had not yet been codified. The above-quoted rule is identical to Rule 806 of the Federal Rules of Evidence, which Illinois courts have previously cited and applied as the law in Illinois. *E.g.*, *People v. Smith*, 127 Ill. App. 3d 622, 630 (1984) (citing Fed. R. Evid. 806 and stating its substance as the rule in Illinois). See also *People v. Johnson*, 271 Ill. App. 3d 962, 965 (1995) (citing Fed. R. Evid. 806 with approval); *Kincaid v. Ames Department Stores, Inc.*, 283 Ill. App. 3d 555, 568 (1996) (citing Fed. R. Evid. 806 with approval). In addition, the Committee Commentary accompanying the new Illinois rules announced that the new rules merely codified "the current law of evidence in Illinois," with the exception of two areas not involved here. Ill. R. Evid., Committee Commentary (eff. Jan. 1, 2011). With respect to Rule 806, the committee observed:

> "Rule 806 dispenses with the requirement of an opportunity to deny or explain an inconsistent statement or conduct of an out-of-court declarant under all circumstances when a hearsay statement is involved. Whether Illinois law had already dispensed with the requirement *** [is] unclear." Ill. R. Evid., Committee Commentary (eff. Jan. 1, 2011).

¶ 112    Even if the above requirement persisted, which is in doubt, the declarant in the case at bar was confronted during cross-examination concerning his grand jury statement and his prior statement to the police on August 4, 1999. Thus, this requirement, even if it still existed, would not have barred the defense from introducing evidence of these statements.

¶ 113    For these reasons, I find that it was error, as a matter of law, for the trial court to have ruled that defendant's prior opportunity to cross-examine barred his present ability to perfect the impeachment.


¶ 114                              C. Harmless Error Analysis

¶ 115    Having found error, I must now determine whether the error was harmless. As we observed above, an error is harmless if "it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *Stechly*, 225 Ill. 2d at 304.

¶ 116    On appeal, defendant focuses particularly on his inability to perfect the impeachment of the missing witness on the issue of whether Jones pushed his mother into the alley after he heard gunshots. If Jones was occupied pushing his mother into the alley, then this affected

-20-

his ability to turn and observe defendant standing on the corner with a rifle.

¶ 117    At trial, Jones testified that when he heard gunfire, he ducked between a parked vehicle and a tree. As soon as the gunfire stopped, he looked to see where his mother was and observed that she was jogging toward their house. Then he looked toward Leo High School and observed defendant with a rifle in his hands. By contrast, in his prior statements, he stated that, after he heard the shots, he pushed his mother toward the alley. At trial, he denied having pushed his mother into an alley, and he denied having told this to the police. A police officer's testimony to the contrary might have led the jury to conclude that Jones was lying about having seen defendant immediately after the gunfire.

¶ 118    I cannot say, "beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *Stechly*, 225 Ill. 2d at 304. The testimony of two witnesses identified defendant with a rifle: the self-serving testimony of his codefendant, and the testimony of a missing witness whose impeachment the defense was not allowed to support. As a result I cannot say, beyond a reasonable doubt, that the trial court's clear legal error did not contribute to the verdict.

¶ 119                                   CONCLUSION

¶ 120    As stated above, I would find first that, after defendant raised the issue of lack of evidentiary support for admission of the fingerprint evidence, the trial court erred by failing to consider whether the State had established an adequate basis for admission of this evidence. Second, after reviewing the entire record, I would find that the State did fail to establish an adequate basis for the expert's testimony. Third, I would find that, in light of the conflicting narratives offered by the State's own witnesses, this error was not harmless. Fourth, I would find that the trial court also erred with respect to the fingerprint evidence by failing to hold a *Frye* hearing concerning whether the particular methodology employed by this particular examiner in this case was generally accepted. Fifth, I would find that the trial court erred by not permitting defendant to perfect the impeachment of the missing witness by introducing evidence of the inconsistent statements. Sixth, since the missing witness was one of only two event witnesses who testified to observing defendant with a rifle and the other was the codefendant, who provided self-serving testimony, I would find that this error was also not harmless. Last but not least, I would find that the cumulative effect of these errors requires reversal and a remand for a new trial.