NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180564-U

NO. 4-18-0564

FILED
August 25, 2020
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| RICKY DURAL BATES, | ) | No. 17CF822 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Harris and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held:*   (1) Defendant failed to establish the prosecutor's comments about the results of horizontal gaze nystagmus tests during the State's closing argument were a clear and obvious error.

(2)  The trial court's decision to allow the State's expert witness to testify, if error, was harmless.

(3)  Defendant failed to establish the trial court committed a clear and obvious error when it sentenced defendant.

¶ 2   On April 17, 2018, a jury found defendant, Ricky Dural Bates, guilty of driving under the influence and illegally transporting alcohol. Because defendant had at least six prior convictions for driving under the influence, the charged offense was a Class X felony. On August 13, 2018, the trial court sentenced defendant to nine years in prison. Defendant appeals, arguing he was denied a fair trial because the prosecutor misstated the law on horizontal gaze nystagmus (HGN) testing, the trial court erred by allowing John Wetstein to testify as an expert witness, the

cumulative effect of these errors denied him a fair trial, and the court denied him a fair sentencing hearing. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4          In August 2017, defendant was indicted for aggravated driving under the influence (DUI) of alcohol (625 ILCS 5/11-501(a)(2) (West 2016)), a Class X felony based on his minimum of six prior DUI convictions. The indictment alleged he drove or was in actual physical control of a motor vehicle while under the influence of alcohol.

¶ 5          On April 3, 2018, defendant filed a motion *in limine* to bar John Wetstein, the toxicology training coordinator for the Illinois State Police Division of Forensic Services, from offering expert opinion testimony in this case. The motion alleged defendant would suffer substantial and unfair prejudice if Wetstein was allowed to testify levels of intoxication can be seen at blood alcohol content (BAC) levels as low as 0.03 and opine defendant was intoxicated based on the limited knowledge he had of defendant.

¶ 6          On April 13, 2018, the trial court held a hearing on defendant's motion *in limine*. The court denied the motion, finding Wetstein's expert testimony would assist the trier of fact in determining whether defendant was guilty of DUI, especially because defendant's BAC was under 0.08. The court noted the jury might not completely understand the effects alcohol can have on a person when the person's BAC is less than 0.08.

¶ 7          That same month, defendant's jury trial began. Wetstein was the State's first witness. He testified he was the toxicology training coordinator for the Illinois State Police Division of Forensic Services. The State asked to have Wetstein treated as an expert in the field of toxicology. Defendant objected. While acknowledging the State may have established Wetstein's knowledge regarding toxicology, defendant argued the State did not establish he had

any expertise with regard to this specific case or what may have been going on with defendant. The trial court overruled defendant's objection and allowed Wetstein to testify as an expert in toxicology.

¶ 8 Wetstein testified literature in the field suggests a person with a BAC of 0.03 or higher has some degree of intoxication or impairment. Wetstein testified more impairment is expected to occur as an individual's BAC increases. An individual with a BAC level of 0.03 can be in a euphoric state of intoxication. At this BAC level, a person may have some loss of motor control and attentiveness in judgment, which could affect his or her ability to drive. Wetstein also testified a person can be intoxicated or under the influence of alcohol even if his BAC is less than 0.08.

¶ 9 Wetstein testified he reviewed Chief Travis Cornwall's narrative report and also videos of the arrest and incidents surrounding the arrest. He opined defendant "was undergoing some degree of alcohol intoxication" at the time of his arrest. Defendant renewed his objection to Wetstein offering an opinion as to whether defendant was intoxicated.

¶ 10 On cross-examination, Wetstein admitted he had not interviewed defendant or Chief Cornwall with regard to the accident. He also did not watch all the videos the State made available to him. Instead, he only watched the recording from Cornwall's body camera and some of the dash camera footage on the same disc. Wetstein acknowledged things other than alcohol can contribute to an individual having an automobile accident. Further, Wetstein conceded he was not certified to administer field sobriety tests and considered defendant's performance on these tests only in general terms. Finally, Wetstein acknowledged defendant's behavior during his interactions with Cornwall could have been affected by the accident.

¶ 11 Christina Koenig testified she was driving home from work when she saw

defendant's car weaving near the Chenoa exit on Interstate 55. She followed defendant off the interstate and saw the car was still weaving on the exit ramp. Defendant turned onto Route 24 and then made a wide turn into a gas station. As she was driving past the gas station, she heard a loud crash. She looked and saw defendant's vehicle had collided with a concrete barrier by a gas pump. After turning around, she drove back to the gas station where the accident occurred.

¶ 12 At the gas station, Koenig saw the airbags on defendant's vehicle had deployed, the windshield had shattered, and the front bumper and fender were damaged. She went inside the gas station and told the attendants they should call someone to check on the driver's condition. An attendant at the station told Koenig defendant had thrown a bag in the trash can by the gas pump. Koenig spoke with Chief Travis Cornwall when he arrived at the gas station. Defendant walked into the gas station as they were talking. He did not report the accident to Chief Cornwall. Koenig described defendant's driving to Cornwall and told him about the bag of trash defendant had thrown away. Cornwall picked up the bag out of the trash. The bag contained empty "tallboy" beer cans.

¶ 13 Chief Travis Cornwall of the Chenoa Police Department testified he responded to the report of the accident. He noted defendant's vehicle had struck the red concrete divider, or hoop, separating the gas pump from the parking lot. The car had front end damage, the airbags had deployed, and the windshield was broken in several places.

¶ 14 Cornwall testified the National Highway and Traffic Safety Administration (NHTSA) divides a DUI investigation into different phases. The first phase is when the vehicle is in motion. Possible signs of intoxication during the first phase include swerving, crossing a fog or checkered line, failing to signal, speeding up or slowing down, driving at a speed drastically different than the speed limit or what the conditions allow, wide turns, unsafe lane changes, and

striking or almost striking objects or vehicles. Cornwall stated he did not see defendant's vehicle in motion. However, Christina Koenig told him about defendant's driving. She said defendant's vehicle was weaving between lanes, drifting, swerving, making wide turns, driving at varying speeds, making unsafe lane changes, and eventually struck the concrete barrier. Cornwall testified these were all clues defendant was impaired by alcohol while driving.

¶ 15    Chief Cornwall testified the second phase of a DUI investigation is personal contact with the driver. Under the NHTSA guidelines, a police officer checks whether the driver has glassy, blood shot, or red eyes, balance issues, and/or slurred or mumbled speech. An officer should determine whether the driver smelled of alcohol and observe the driver's appearance.

¶ 16    Inside the gas station, Cornwall made contact with defendant. Defendant swayed as he stood, his breath smelled of alcohol, and his eyes were somewhat glassy and blood shot. His pants were also very wet, which defendant said was from beer and urine.

¶ 17    Defendant admitted to Cornwall he had been drinking. However, defendant was evasive and inconsistent as to when this drinking occurred. He said he drank the night before. He then said he drank around lunchtime and later said earlier in the morning. Defendant also admitted the four empty beer cans ("tallboys") Cornwall found in the trash can were his. Cornwall found two more empty beer cans in defendant's vehicle.

¶ 18    Cornwall decided to administer field sobriety tests, which are part of the third phase of a NHTSA DUI investigation, on defendant. Cornwall noted the NHTSA establishes the standardized field sobriety tests he used with defendant. The standardized tests established by the NHTSA consist of the HGN test, the walk-and-turn test, and the one-leg-stand test.

¶ 19    Nystagmus is associated with possible alcohol impairment. Cornwall testified NHTSA divides the HGN test into different parts. The officer first checks for underlying medical

conditions, including resting nystagmus, different sized pupils, and unequal eye tracking, which could affect the test. Defendant did not have any of these conditions. Cornwall then tested for and detected nystagmus in both eyes in all three sections of the HGN test he administered.

¶ 20        Before Cornwall administered the walk-and-turn test, defendant indicated he had a bad back which could impact his ability to walk a straight line. Cornwall testified he had already observed defendant walk with some slight swaying but no other difficulty from the gas station to the gas pumps. During the test, defendant had trouble following Cornwall's instructions. He was also unable to maintain the starting position, started the test with the wrong foot, took the wrong number of steps, missed heel to toe contact on every step, stumbled several times, swayed, and raised his arms to help with his balance. Cornwall noted NHTSA guidelines provide eight clues to look for during the walk-and-turn test. Defendant displayed six of the clues, indicating possible impairment. Defendant later indicated he had knee issues. Cornwall acknowledged a knee issue could affect the walk-and-turn test.

¶ 21        Before Cornwall administered the one-leg-stand test, defendant indicated he had a problem with one of his legs. Cornwall allowed defendant to choose what leg on which he wanted to stand. Cornwall stated NHTSA guidelines instruct officers to look for four clues on this test. Defendant exhibited three of the four clues, which indicated possible impairment. Defendant was swaying or leaning to one side, raised his arms up for balance, and put his foot down multiple times.

¶ 22        Cornwall testified it was his opinion defendant was under the influence of alcohol and placed him under arrest. Defendant then complained of an elbow injury. After medical workers checked defendant at the scene, Cornwall transported defendant to the police department for a breath test. Defendant complained he had a busted lip from the air bag but did not indicate

he was confused due to a head injury. Defendant took the breath test around 5:01 p.m., showing a BAC of 0.066. Cornwall was dispatched to the accident at about 3:30 p.m.

¶ 23    The State played portions of the recording from Cornwall's body camera and his dash camera for the jury.

¶ 24    On cross-examination, Cornwall admitted defendant said he had problems with both of his knees before he performed the one-leg-stand test. Defendant also complained about the wind before he performed the walk and turn test. Cornwall acknowledged he did not observe defendant driving his vehicle, other things could have affected defendant's driving, and his red, blood-shot eyes and his slurred speech could have resulted from something other than intoxication. Cornwall admitted he did not know how defendant normally spoke.

¶ 25    On re-direct, Cornwall testified defendant did not say the wreck was caused by fatigue or some other medical issue.

¶ 26    Defendant chose not to put on any evidence.

¶ 27    In its closing argument, the State went over the jury instructions and the evidence it presented, arguing it proved defendant's guilt beyond a reasonable doubt. With regard to defendant's performance on the HGN test, the State summarized the evidence in part as follows:

> "[Chief Cornwall] first does the first portion of the HGN, smooth pursuit, making sure the eyes equally smoothly track, and if they start to jerk that's a possible sign of alcohol impairment. He has to test for both eyes. There's nystagmus in the smooth pursuit portion in both [of defendant's] eyes, two clues of alcohol impairment according to NHTSA.
>
> We move on to the second portion of the HGN, sustained and distinct nystagmus at maximum deviation. Basically, you bring the eye all the way out so

you can basically just see the whites, and then after four seconds is there jerking? If there is jerking or nystagmus, that is an indicator of alcohol impairment. You check both eyes over four seconds. The officer testified that there was nystagmus at sustained and distinct deviation. So two more clues of alcohol impairment during the HGN.

The last one, onset of nystagmus prior to 45 degrees, meaning you put it in front of the nose, you drag it out to the side, and then do you see nystagmus before reaching 45 degrees? Do you see the eye jerking before you get there? That, according to NHTSA, is a clue of alcohol intoxication or impairment. The officer says, yes, that was there too, so one for each eye. Two more clues of alcohol impairment. So together we have six out of six. That, according to NHTSA— which you only need four, by the way—that, according to NHTSA, indicates possible alcohol impairment.

And I want to address this for a second. He also has some non-NHTSA clues of possible impairment such as he's not following directions. And following directions is an important part of a test as well, because alcohol can interfere with people's ability to understand, their judgment, their coordination, their attentiveness. ISP Forensic Scientist Toxicologist John Wetstein testified that even at .03 or higher those can affect you. So attentiveness, being able to listen to directions is an important indicator of whether or not you are sober. The officer has to remind him to keep his head still. The HGN is also important, because the walk and turn and the one-leg stand defendant says, well, I have a bad back, I have bad knees. Those could interfere with the test, to be honest, they could, but it

doesn't explain the HGN. Nothing is wrong with his eyes. He got a perfect score for an intoxication, six out of six."

¶ 28    During defendant's closing argument, defense counsel stated:

"[The] State just told you to not get hung up on a number, but .066 is a number. It is the only piece of evidence that the State has given you that actually gives you the amount of alcohol that was in [defendant's] system, .066.

We spent a lot of time yesterday, and the State just spent a lot of time today going over all the different phases and field sobriety tests. But what did each of those end with? Possibly impaired by alcohol. The State said today that several of the eye tests were indicators of alcohol. That's not what we heard in the testimony. They were all possible indicators of alcohol. And why did they put that in there? Because all of these indicators could be caused by something else other than alcohol."

¶ 29    The trial court then instructed the jury in part:

"A person is under the influence of alcohol when, as a result of drinking any amount of alcohol, his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care.

                    ***

If you find at the time the defendant drove or was in actual physical control of a vehicle that the amount of alcohol concentration in the defendant's blood or breath was more than a .05 but less than a .08 this does not give rise to any presumption that the defendant was or was not under the influence of alcohol. You should consider all of the evidence in determining whether the defendant was under

- 9 -

the influence of alcohol."

After deliberations, the jury found defendant guilty of both driving under the influence of alcohol and illegal transportation of alcohol.

¶ 30    On May 9, 2018, defendant filed a motion for judgment of acquittal notwithstanding the verdict or a new trial. On August 13, 2018, the trial court denied defendant's motion. With regard to defendant's sentence, the State asked for a 12-year prison sentence, noting this was defendant's eighth DUI. The trial court sentenced defendant to 9 years in prison with 3 years of mandatory supervised release and credit for 375 days of presentence custody.

¶ 31    This appeal followed.

¶ 32                                II. ANALYSIS

¶ 33                            A. HGN Test Results

¶ 34    Defendant first argues he was denied a fair trial because the State incorrectly and repeatedly stated during its closing argument the HGN test demonstrated defendant was intoxicated or impaired, ignoring the Illinois Supreme Court's ruling in *People v. McKown*, 236 Ill. 2d 278, 924 N.E.2d 941 (2010). As a result, defendant asks this court to reverse defendant's conviction and remand the matter for a new trial.

¶ 35    The State argues defendant forfeited any complaint regarding the prosecutor's closing argument because defendant did not object at trial. We agree. To preserve an issue for appeal, a defendant is required to both object during his trial and raise the issue in a written posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Regardless of forfeiture, defendant asks this court to review the issue pursuant to the plain-error doctrine.

¶ 36    Our supreme court has identified two instances when it is appropriate to excuse an appellant's procedural default. *Sebby*, 2017 IL 119445, ¶ 48. The first instance is "when a clear

or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error[.]" (Internal quotation marks omitted.) *Sebby*, 2017 IL 119445, ¶ 48. The second instance is "when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Sebby*, 2017 IL 119445, ¶ 48. Ordinarily, the first step in the plain error analysis is determining whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 37 "Generally, prosecutors have wide latitude in the content of their closing arguments." *People v. Evans*, 209 Ill. 2d 194, 225, 808 N.E.2d 939, 956 (2004). However, to ensure a defendant receives a fair trial, a prosecutor should not misstate the law. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 29, 43 N.E.3d 128. "Improper remarks will not merit reversal unless they result in substantial prejudice to the defendant, considering the context of the language used, its relationship to the evidence, and its effect on the defendant's rights to a fair and impartial trial." *People v. Smith*, 141 Ill. 2d 40, 60, 565 N.E.2d 900, 908 (1990). "A reviewing court will find reversible error based upon improper comments during closing arguments only if a defendant can identify remarks of the prosecutor that were both improper and so prejudicial that real justice [was] denied or that the verdict of the jury may have resulted from the error." (Internal quotation marks omitted.) *Evans*, 209 Ill. 2d at 225, 808 N.E.2d at 956. We review allegations of prosecutorial misconduct *de novo*. *People v. Wheeler*, 226 Ill. 2d 92, 121, 871 N.E.2d 728, 744 (2007).

¶ 38 During its closing argument, while discussing the results of the different parts of the HGN test, the State indicated the different parts of the test provided clues of defendant's

possible impairment. The prosecutor stated Chief Cornwall testified defendant had nystagmus in both eyes during the three subparts of the HGN test. According to the prosecutor, these were "clues of alcohol impairment." Then summarizing the police officer's findings on the HGN test, the prosecutor stated, "So together we have six out of six. That, according to NHTSA—which you only need four, by the way—that, according to NHTSA, indicates possible alcohol impairment."

¶ 39 Defendant has failed to establish the prosecutor erred in stating the nystagmus findings were "clues of alcohol impairment" or indicated "possible alcohol impairment." In *McKown*, 236 Ill. 2d at 302, 924 N.E.2d at 954, our supreme court noted the use of the results of HGN tests at trial should be limited to the conclusion that a failed test suggests a defendant may have consumed alcohol and may have been under the influence. The State should not try to use the results to establish a BAC level or level of intoxication. *McKown*, 236 Ill. 2d at 302, 924 N.E.2d at 954. By stating the nystagmus findings were "clues of alcohol impairment" or "indicate[ ] possible alcohol impairment," the prosecutor did not violate our supreme court's holding in *McKown*. The supreme court stated a testifying police officer can state he based his opinion a defendant was under the influence and impaired in part based on the defendant's HGN test results. *McKown*, 236 Ill. 2d at 306, 924 N.E.2d at 957. In other words, the HGN results can be mentioned as a clue or indicator of possible impairment.

¶ 40 We next address the prosecutor's later statement regarding defendant's HGN test results. The prosecutor stated defendant "got a perfect score for an intoxication, six out of six." When read by itself, this statement is problematic. However, it does not rise to the level of a clear and obvious error when considered in the context of the rest of the State's closing argument.

¶ 41 Based on our review of the transcript of the State's entire closing argument, it

appears the prosecutor poorly chose his words as opposed to making an effort to misstate the law, considering he had earlier, and repeatedly, indicated defendant's performance on different parts of the HGN test were only clues of possible impairment. The prosecutor was not attempting to tell the jury to rely exclusively on the results of the HGN test. After all, the prosecutor told the jurors they should consider all of the evidence in determining whether or not defendant was under the influence of alcohol. The State explained it would be entirely up to the jury to determine whether defendant was under the influence based on the evidence presented because defendant's BAC of 0.066 allowed for no presumptions in favor of the State or defendant. The State also discussed in its closing all of the evidence it presented against defendant—which the HGN test was only a part—including the defendant's driving, the fact he collided with a stationary object, the smell of alcohol on his breath, his admissions of drinking alcohol and throwing empty beer cans in the trash at the gas station after the accident, his urine and beer soaked shorts, his swaying and slurred speech, his inattentiveness, his performance on two other field sobriety tests, and his BAC level of 0.066 approximately an hour and a half after the accident. The prosecutor's misstatement did not substantially prejudice defendant in this case.

¶ 42                        B. The State's Expert Witness

¶ 43        We next address defendant's argument he was denied a fair trial when the trial court denied his motion *in limine* and permitted John Wetstein to testify as an expert at his trial. According to defendant, Wetstein's testimony lacked the necessary foundation to be allowed, was unnecessary, and was likely to mislead the jurors.

¶ 44        Defendant argues, *inter alia*, the trial court should not have permitted Wetstein to (1) testify about the degree of intoxication or impairment of a subject whose BAC level is 0.03 or more and (2) offer his "expert" opinion defendant was under the influence when Wetstein's

- 13 -

opinion was based in large part on his review of the police officer's narrative report and a portion of the video of the arrest rather than on his expertise as a toxicologist. Although we find Wetstein's testimony troubling, we conclude any error in its admission was harmless.

¶ 45        "The improper admission of evidence is harmless where there is no reasonable probability that, if the evidence had been excluded, the outcome would have been different." (Internal quotation marks omitted.) *People v. Brothers*, 2015 IL App (4th) 130644, ¶ 97, 39 N.E.3d 1101.

> " 'When deciding whether error is harmless, a reviewing court may (1) focus on
> the error to determine whether it might have contributed to the conviction;
> (2) examine the other properly admitted evidence to determine whether it
> overwhelmingly supports the conviction; or (3) determine whether the improperly
> admitted evidence is merely cumulative or duplicates properly admitted
> evidence.' " *Brothers*, 2015 IL App (4th) 130644, ¶ 98 (quoting *In re Rolandis G.*,
> 232 Ill. 2d 13, 43, 902 N.E.2d 600, 617 (2008)).

In this case, the jury was able to watch video showing defendant's condition after the accident. The jury also heard Koenig's testimony as to how defendant was driving before the accident. Further, Chief Cornwall testified he believed defendant was under the influence of alcohol based on his observations of defendant. Defendant failed all three field sobriety tests he was given. Over an hour and a half after the accident, defendant's BAC level measured at 0.066. Further, defendant admitted drinking, his breath smelled of alcohol, his shorts were soaked with beer and urine, and he had violently collided with a stationary object. The evidence in this case—even absent Wetstein's testimony—was not closely balanced and overwhelmingly supported defendant's conviction.

¶ 46                                    C. Cumulative Error

¶ 47        Defendant next argues he was denied a fair trial because of the cumulative effect of the State being allowed to bolster its evidence against defendant with misstatements of law about the HGN tests and Wetstein's "unnecessary, confusing, and unreliable expert opinion." Based on our analyses in the preceding sections, this argument is without merit and need not be addressed further.

¶ 48                                         D. Sentence

¶ 49        As his final argument, defendant asserts the trial court denied him a fair sentencing hearing by using a factor inherent in the offense of driving under the influence as an aggravating factor. According to defendant, "[T]he circuit court determined that, in aggravation, all driving-under-the-influence cases pose a serious threat of harm to others. In so doing, the circuit court relied on [a] factor already inherent in the offense of driving while intoxicated that was contemplated by the legislature in setting the sentencing range for that offense."

¶ 50        Defendant did not object to the trial court considering this factor at the sentencing hearing. Further, he did not file a motion to reconsider his sentence. As a result, he forfeited this argument. *People v. Hillier*, 237 Ill. 2d 539, 544, 931 N.E.2d 1184, 1187 (2010).

¶ 51        Defendant asks us to review this issue pursuant to the plain-error doctrine. For this court to review a forfeited error during sentencing, a defendant must show a clear or obvious error occurred and either (1) the evidence at the sentencing hearing was closely balanced or (2) the error was so egregious the defendant was denied a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545, 931 N.E.2d at 1187. Based on the record in this case, defendant has not established a clear and obvious error occurred.

¶ 52        At the sentencing hearing, the trial court did state the following, "There's also

factors in aggravation as well. Any time somebody gets behind the wheel if they have consumed substances to the point of impairment, their conduct causes and threatens serious harm to other people. That is really something that goes, really, without saying." Defendant argues the trial court was clearly considering the threat of serious harm to others as an aggravating factor. However, we note the trial court never said it was treating the threat of serious harm to others as an aggravating factor in this case. Further, a persuasive argument can be made the trial court was actually indicating this could not be considered an aggravating factor in this case because someone driving a vehicle impaired is always a threat to others. As a result, we do not find defendant has established the trial court committed a clear or obvious error.

¶ 53                              III. CONCLUSION

¶ 54          For the reasons stated, we affirm the trial court's judgment.

¶ 55          Affirmed.